UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRENDA VANDEWEGHE, | : | Civil Action |
| | : | |
| Plaintiff, | : | Case No. _____ |
| | : | |
| v. | : | |
| | : | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | : : | |
| | : | |
| Defendant. | : | September 1, 2020 |

## COMPLAINT

Plaintiff Breda VanDeWeghe, for her complaint against Defendant International Business Machines Corporation, alleges as follows:

## NATURE OF THE ACTION

1.  This is an action seeking damages based on Defendant's discriminatory practices in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), and the Connecticut Fair Employment Practices Act, Connecticut General Statutes § 46a-51, *et seq.* ("CFEPA"). Beginning in 2012, Defendant began terminating older employees disproportionately to its younger employees, did not offer older employees open positions, and engaged in other tactics targeting its older employees in an effort to create a significantly younger workforce.  This conduct constitutes unlawful discrimination under the ADEA and CFEPA.  Plaintiff, as an older employee, was treated less favorably than her younger peers and, as a result of a concerted corporate policy to create a "younger" workforce, was terminated.

## PARTIES

2.     Plaintiff Brenda VanDeWeghe is an individual residing at 115 Colonial Road, Unit 58, Stamford, Connecticut 06906.

3.     Defendant International Business Machines Corporation ("IBM") is a New York corporation with its principal place of business located at 1 New Orchard Road, Armonk, New York 10504. IBM does business in the State of Connecticut and, on information and belief, maintains local offices at Milford and Southbury, Connecticut.

## JURISDICTION AND VENUE

4.     Jurisdiction over the subject matter of this litigation exists pursuant to 28 U.S.C. §1331 as Plaintiff asserts a claim under the ADEA.  As to those claims not arising under federal law but clearly so related to the claims in this action within the original jurisdiction of this Court, jurisdiction exists under the doctrine of supplemental jurisdiction as codified in 28 U.S.C. §1367, as well as due to diversity of citizenship pursuant to 28 U.S.C. §1332 in that the action involves citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

5.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b)(2) as the unlawful conduct giving rise to Plaintiff's claims took place within the District of Connecticut.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6.     Plaintiff timely filed administrative charges of discrimination and retaliation with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") on September 17, 2018 and has received a Right to Sue letter from the EEOC dated June 3, 2020, as well as a Release

to Sue from the CHRO dated June 3, 2020.  Copies are attached hereto as Exhibits A and B, respectively.

## STATEMENT OF FACTS

7.	In February of 2010, Plaintiff began working for IBM as an independent contractor through a private employment service. Plaintiff worked for IBM's Global Business Services ("GBS"), IBM's consulting services business unit. Her duties involved recruiting individuals to work for GBS.

8.	Plaintiff performed well in her recruiting role and in March of 2011, IBM offered her a position as a "long-term supplemental employee" ("LTS"). As an LTS, Plaintiff was an IBM employee.

9.	On information and belief, in or about 2012, IBM instituted a program to become a more youth-oriented – and demographically youthful – company. Specifically, IBM embarked on a massive reinvention and rebranding campaign that had two principal objectives: first, to transform IBM into a "Cognitive Solutions" company deeply invested in the Cloud, Analytics, Mobile, Security and Social technology markets ("CAMS"), and second, to change the face of IBM by recruiting and retaining "digitally native" Millennials, which IBM defined as the generation born after 1980.

10.	In May of 2014, IBM offered Plaintiff a full-time regular position as a recruiter for GBS.

11. At a 2014 conference titled "Reinvention In The Age of The Millennial," IBM expressly linked its success to Millennials, asserting that IBM's "future growth will be influenced by the values system of Millennials …" [1]

12. Millennials represented a "trillion dollar market" and "billions" of dollars in potential sales for IBM. To capture the Millennial market, IBM stated it had to "become one with the Millennial mindset." "Mindshare converts to marketshare," IBM wrote, and IBM's "leadership in millennial engagement is the ideal value proposition for generating CAMS pipeline, which is driven by Millennial traits." [2] According to one IBM spokesperson, "the secret to capturing the hearts, minds, and most importantly, wallets of the millennial generation is likely working with you. Your millennial employees are your most valuable and accessible asset when it comes to successfully marketing your business to the millennial generation." [2]

13. In 2014, IBM published "Millennials: How IBM can effectively attract, engage and retain this emerging generation." Because Millennials meant big money for IBM and because IBM "face[d] major competition with [other] companies acquiring Millennials, both within the tech sector (i.e., Microsoft, Amazon) and beyond," IBM developed a "strategy to attract top Millennial talent."

---

[1] See *Reinvention in the Age of the Millennial*, IBM Center for Applied Insights Blog published December 16, 2014, accessed at https://ibmcai.com/2014/12/16/reinvention-in-the-age-of-the-millennial/ (copy attached as Exhibit C).

[2] See *Marketing and the Millennial Mindset – An Interview with IBM's Samantha Klein*, The Marketing Journal, June 3, 2016, available at http://www.marketingjournal.org/marketing-andthe-millennial-mindset-an-interview-with-ibms-samantha-klein/ (copy attached as Exhibit D).

4

14. IBM also instituted an "Early Professional" hiring program targeted solely at young professionals. "The idea is to bring in as much young talent into the workforce with every given opportunity." [3]

15. In June of 2015, IBM changed Plaintiff's role to North American Executive Referral Program Manager. Plaintiff's duties included managing referrals of IBM executives across all business units, in North America.

16. IBM's recruitment targets were divided into two primary groups: early professional hires (EPHs) and experienced professionals (EPs). EPHs were defined broadly as persons with less than three (3) years of post-graduate work experience; EPs were defined broadly as individuals with greater than three (3) years post graduate work experience.

17. From the spring of 2014, IBM's recruiting targets shifted drastically from EPs to EPHs in an obvious attempt to populate the company's ranks with younger employees.

18. Plaintiff's recruiter position required her attendance at many meetings in which IBM's recruitment strategy was explained and discussed for purposes of implementation. In short, beginning in or about the spring of 2014, IBM human resources executives repeatedly stressed that targets for recruitment of EPHs would be substantially increased, with targets for EPs correspondingly decreased.

19. In her role as a recruiter, Plaintiff received many documents that emphasized IBM's approach to establishing a younger corporate demographic. One

---

[3] See *IBM's New Team to Focus on Millennials*, Business Standard, May 31, 2016, accessed at http://www.business-standard.com/article/companies/ibm-s-new-team-tofocus-on-millennials-116053000677_1.html (copy attached as Exhibit E).

such document (attached as Exhibit F) provided to the IBM GBS recruitment team (including Plaintiff) in 2014 emphasized the direction and focus of recruitment efforts in favor of EPHs. As noted in Exhibit F, as of 2014, the GBS recruitment team was told to "[h]ire 80% of all hires as early professions" and to "[b]ackfill open seats with promotions." In this way, older employees would be moved out as the more newly-hired EPHs moved up the ranks.

20. Exhibit F is only one example of many similar documents provided to IBM recruiters to implement management's demographic policy. Moreover, on information and belief, the same policy – supported by the same type of document – were used in all IBM business units, not just GBS.

21. "Successor generations X and Y are generally much more innovative and receptive to technology than baby boomers," IBM wrote in another publication. [4] "[A]ge is catching up with Baby Boomers," whom IBM referred to as "gray hairs" and "old heads." [5] Boomers were leaving work in increasing numbers "due to retirement or disability." Those still working often needed accommodations for "'wear and tear' disabilities like hearing and vision impairment [sic] that older people routinely develop."[6]

---

[4] See *The Maturing Workforce, Innovation in Workforce Enablement*, IBM Business Consulting Services, 2006, p. 6, available at https://www-935.ibm.com/services/uk/bcs/pdf/maturing-workforce-feus01291-1.pdf (copy attached as Exhibit G).

[5] Id. at pp. 2-3.

[6] Id. at p. 3.

22.     In a 2015 paper entitled "To buy or not to buy? How Millennials are reshaping B2B marketing," [7] IBM again found that Boomer employees were not motivated to consult their colleagues before making decisions. This was a negative trait because "[f]or leading organizations, a corporate culture of collaboration and consensus building is needed." To create that culture, IBM recommended that companies "[p]ut Millennials on [their] sales and marketing teams."

23.     In August, 2016, IBM Marketing Manager Erika Riehle stereotyped Boomer employees as contributing to five workplace "dysfunctions." [8] According to IBM, Boomers are less trusting of their co-workers, less collaborative, less committed, less accountable and less attentive to results. Compared to younger employees, IBM found that Boomers were the least likely to understand IBM's business strategy, least likely to understand their manager's expectations of them, least likely to understand what customers wanted, and the least likely to understand IBM's brand.

24.     In her position as a GBS recruiter and later as Program Manager for North American Executive Referrals, Plaintiff was well aware of IBM's employee recruiting strategy, as summarized in Paragraphs 9 through 23, above.

25.     Plaintiff was a productive and successful employee and her performance routinely met or exceeded IBM's expectations.

26.     In March of 2018, Plaintiff was 63 years old.

---

[7] Available at http://www-01.ibm.com/common/ssi/cgibin/ssialias?htmlfid=GBE03658USEN (copy attached as Exhibit H).

[8] See *Managing Millennials: 5 Common Issues Leaders Face*, published August 24, 2016, accessed at https://www.ibm.com/blogs/social-business/2016/08/24/managingmillennials-5-common-issues-leaders-face/ (copy attached as Exhibit I).

27.     On March 28, 2018, Plaintiff's manager, Louise Trudeau (Global Process Talent Acquisition Leader), informed Plaintiff that her job was being eliminated and that she was being permanently laid off effective June 28, 2018 as part of a "Resource Action," commonly referred to as an RA.  Ms. Trudeau said Plaintiff would be offered a severance package with an employment end date of June 27, 2018.  Ms. Trudeau also said Plaintiff would have a 30-day review period to decide whether to accept the terms of the Severance Agreement, which would include a month's severance pay and subsidized COBRA.

28.     Shortly thereafter, Plaintiff received a severance package that included the offer Ms. Trudeau described on March 28, 2018.  The severance agreement IBM presented for Plaintiff's signature included a release of all claims, with the exception of age discrimination claims, which Plaintiff could pursue only through arbitration.

29.     After being informed of her termination, Plaintiff applied for other positions with IBM in an effort to continue her employment, but she was not hired for any of them.

30.     On March 23, 2018, less than a week before she was given notice of her termination, Plaintiff read a Propublica investigative article concerning the U.S. Equal Employment Opportunity Commission's large-scale investigation of IBM's discriminatory employment practices.[9]

---

[9] See Cutting Old Heads at IBM, Propublica, March 22, 2018, available at https://features.propublica.org/ibm/ibm-age-discrimination-american-workers/ (attached as Exhibit J).
.

31.     Once Plaintiff read the Propublica article, she recognized the discriminatory methods and practices mentioned, as Plaintiff experienced them first hand.  As noted above, because of her recruitment role, Plaintiff was aware for some time that IBM had changed its focus to hiring "younger" employees.

32.     On May 17, 2018, Propublica issued a companion article focusing on the U.S. Equal Employment Opportunity Commission's large-scale investigation of IBM's discriminatory practices. [10]

33.     Both prior to and after learning of her termination, Plaintiff often checked the Facebook page, Watching IBM: https://www.facebook.com/alliancemember/. Plaintiff noticed that virtually all of the individuals who were let go in the March 2018 Resource Action (RA) were over 40 years old.

34.     IBM treated substantially younger persons more favorably by (a) signaling through its internal and external branding and marketing that IBM wished to hire and/or retain younger persons, (b) applying subjective reduction-in-force criteria designed to screen out older workers; (c) not selecting younger persons for reduction, (d) providing younger workers training opportunities that were not provided to older workers, and (e) transferring younger employees selected for reduction to other positions in IBM.

35.     When IBM conducts a "Resource Action" (IBM speak for a reduction in force), it shields its youngest employees from lay-off. IBM's Early Professionals are exempt from reduction for nine months from their hire date. Only IBM's youngest workers receive this special treatment.

---

[10] See *Federal Watchdog Launches Investigation of Age Bias at IBM*, Propublica, May 17, 2018, available at https://www.propublica.org/article/federal-watchdog-launchesinvestigation-of-age-bias-at-ibm (attached as Exhibit L).

9

36.     Not only does IBM shield its youngest workers from lay-off, at the same time as IBM has laid off thousands of Baby Boomers, it has aggressively recruited and hired many thousands of Millennials and members of Generations X and Z.

37.     The deliberate age-based impact of IBM's lay-offs was so stark and so statistically significant that in 2014, IBM stopped requesting ADEA releases from its terminated older workers. [11]  IBM did this to circumvent the Older Workers Benefits Protection Act ("OWBPA").[12]  Although IBM stopped requesting releases of ADEA claims, it nonetheless required any older worker who accepted IBM's one month severance offer to privately arbitrate their ADEA claims, subject to limited discovery and a full waiver of the right to pursue or participate in a collective action under the ADEA.

38.     Age discrimination taints IBM's resource actions because IBM's objective is to make room for younger employees. But for IBM's move to reinvent itself in the age of the Millennial and its campaign to attract, engage and retain Millennial talent, older workers like Plaintiff would not have been let go.

39.     Although IBM involuntarily terminated Plaintiff, IBM subsequently recorded her as having "resigned."  Plaintiff was also informed that IBM intended to code her termination as "retired" rather than involuntary termination.

---

[11] See *IBM Halts Practice of Disclosing Ages of Fired Older Workers*, AARP Work Matters, May 12, 2014, available at http://blog.aarp.org/2014/05/12/ibm-halts-practice-ofdisclosing-fired-older-workers/. ("OWBPA") (attached as Exhibit L).

[12] Under OWBPA, an employer requesting an ADEA waiver in connection with a group termination program must provide terminated employees with a list of "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program." 29 U.S.C. § 626(f)(1)(H)(ii). Congress mandated the disclosure of this comparative information because it believed that "[t]he principal difficulty encountered by older workers in [a RIF] is their inability to determine whether the program gives rise to a valid claim under the ADEA... The informational requirements set forth in the bill are designed to give all eligible employees a better picture of these factors." S. Rep. No. 101–263, at 67 (1990), reprinted in 1990 U.S.C.C.A.N. 1509.

40. While Plaintiff's manager stated that the reason for her layoff was job elimination, Plaintiff was a target of age discrimination.

41. Had Plaintiff been younger, IBM would not have terminated her employment.

42. Plaintiff's age was a motivating factor in her selection for termination.

## CLAIMS FOR RELIEF

**COUNT ONE – AGE DISCRIMINATION IN VIOLATION OF THE ADEA, 29 U.S.C. §623(d)**

1-42. Plaintiff hereby repeats and realleges Paragraphs 1 through 42 as if more fully set forth herein.

43. Plaintiff was at all times relevant hereto an "employee" as that term is defined in 29 U.S.C. §630(f).

44. IBM is an "employer" within the meaning of 29 U.S.C. §630(b).

45. At all relevant times hereto, IBM employed more than 20 persons.

46. IBM discriminated against plaintiff on the basis of age in violation of the ADEA, 29 U.S.C § 623(a).

47. As a direct and proximate result of the IBM's conduct, Plaintiff has suffered damages, including but not limited to substantial loss in earnings.

**COUNT TWO – AGE DISCRIMINATION IN VIOLATION OF CFEPA,
CONN. GEN. STAT. § §46A-60(a)**

1-42. Plaintiff hereby repeats and realleges Paragraphs 1 through 42 as if more fully set forth herein.

43. Plaintiff was at all times relevant hereto an "employee" as that term is defined in Connecticut General Statutes §46a-51(9).

44. IBM is an "employer" as that term is defined in Connecticut General Statutes §46a-51(10).

45. At all relevant times hereto, IBM employed more than three persons.

46. Defendant's conduct, by and through its agents, in treating Plaintiff in a manner unequal to other employees, discriminatorily denied Plaintiff equal treatment on the basis of her age in violation of C.G.S. §46a-60(b)(1).

47. As a result of IBM's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

WHEREFORE, Plaintiff seeks the following relief:

1. Compensatory damages, including loss of enjoyment of life, emotional pain and suffering, back pay, bonuses, and the value of all other employment benefits in an amount to be determined by the trier of fact, with interest from the date when said sums were due;

2. Front pay;

3. Liquidated damages under the ADEA;

4. Punitive damages;

5. Attorneys' fees;

6. Prejudgment interest and costs; and

7. Such other and further relief as this Court shall deem just and proper.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demand a trial by jury on all issues so triable.

                PLAINTIFF
                BRENDA VANDEWEGHE

By:   /s/ *Douglas J. Varga*
        Douglas J. Varga (CT18885)

    Lucas & Varga LLC
    2425 Post Road, Suite 200
    Southport, CT 06890
    Tel: (203) 227-8400
    Fax: (203) 227-8402
    E-Mail: dvarga@lucasvargalaw.com

Her Attorneys

13